## THE NEW WINDSOR.

## UNITED STATES v. JACKSONVILLE FOR-WARDING CO.

(District Court, S. D. Florida. April 23, 1925.)

No. 1802.

**1. Towage** ☞15(2).

Libelant has burden of proving allegation that grounding of vessel and consequent damage was result of negligence and unskillfulness of persons in charge of tugs moving it from dock to main channel.

**2. Towage** ☞15(2).

Evidence *held* not to show that grounding of vessel and consequent damage was result of negligence and unskillfulness of persons in charge of tug, in attempt to move it from dock to main channel.

**3. United States** ☞133.

Where government enters into ordinary business outside of strict government matters, it is responsible for delay and laches of its agents, and plea of laches will be entertained against it.

**4. Admiralty** ☞34—Libel by United States for damages to ship, grounded when being moved from dock to main channel more than three years before filing libel, held barred by laches.

Libel by the United States against owner of tugs for damages to vessel, grounded when being moved from dock to main channel more than three years before libel was filed, *held* barred by laches.

In Admiralty. Libel by the United States, as owner of the steamship New Windsor, against the Jacksonville Forwarding Company. Libel dismissed.

W. M. Gober, U. S. Atty., and Maynard Ramsey, Asst. U. S. Atty., both of Tampa, Fla. (Clinton M. Hester, Admiralty Atty., U. S. Shipping Board, of Washington, D. C., of counsel), for the United States.

George C. Bedell, of Jacksonville, Fla., for respondent.

CALL, District Judge. On July 16, 1923, the libelant filed its libel, in which it is alleged that it was the sole owner of the steamship New Windsor, setting out the dimensions of said ship; that respondent was the owner of the steam tugs Volunteer and St. Johns; that on July 3, 1920, the steamship was moored on the south side, bow in, to the wharf of the Cummer Lumber Company, loaded with phosphate; that on last-mentioned day, in response to the application of the ship's officers, the tugs Volunteer and St. Johns came to the dock for the purpose of moving the ship from the dock to the main channel of the St. Johns river, and thereupon the master of the tug Volunteer went upon the bridge of the ship and took full charge; that the two tugs took positions on the port side of the ship; that the weather was clear; that the tugs were not of sufficient capacity to perform the towage, nevertheless the master of the Volunteer, knowing this and the condition of wind and tide, ordered the ship's lines cast off, her engines put full speed astern, her helm put hard aport, and the two tugs ordered full speed ahead, in order to hold the ship off the south bank of the channel leading to the main channel; that the tugs were unable to hold the ship off, and she grounded in the mud bank to the south of the channel; that on the night of July 5th the ship, after discharging her fuel oil into a lighter, by means of her tackle hauled herself off the bank, but fell back, for the reason that no tugs were present to hold her off; that said ship was floated July 6th and safely anchored; that the grounding and damage suffered thereby was due solely to the negligence, carelessness, and want of skill and care on the part of respondent and those in charge of its steam tugs, especially the master of the Volunteer, for miscalculating the strength of the tide and for failing to have sufficient tugs to hold the ship off the bank. Then follows a statement of damages suffered by reason of said stranding.

The respondent filed its answer, incorporating therein an exception that the libel showed that the cause of action therein propounded occurred more than three years before libel was filed, and subject to said exceptions alleges that the cause of action occurred prior to July 7, 1920; that no notice of claim was given respondent until the 11th of December, 1922, and then only by formal notice that libelant intended to make claim for damages sustained in the grounding of said ship; that on a date subsequent to June 25, 1923, respondent received from libelant a claim for damages sought to be recovered in the libel; that the bills of the respondent for the service of its tugs in pulling on said ship on July 4th, 5th, and 6th in the efforts to float the ship were paid about July 17, 1920, without objection; that before and during all the time the respondent had and maintained its office in the city of Jacksonville and had its tugs in the waters of the St. Johns river.

The answer then proceeds, and alleges that about July 2d the ship's representative applied to it for tugs to assist in undocking the vessel; that respondent was without knowledge of the draft of the ship; that respondent informed the ship's representative that there

was but 24 feet of water in said channel; that it is untrue that the Volunteer's master took full charge of the ship, or that he exercised any duties other than communicating orders to the tugs; that the master of the ship and other officers were at their proper stations, and a duly licensed pilot on the bridge, with the master of the ship in charge of her movements, which were under her own steam, with the tugs assisting; that it is untrue the tugs had not sufficient power to perform the towage, or that the master of the Volunteer knew or believed them of insufficient power, or that the master of the Volunteer negligently or otherwise ordered the lines of the ship cast off and her engines put full speed astern; that it is untrue that the tugs were unable to hold the vessel up, or that the tide carried her across the south bank of the local channel, but alleges that the vessel was drawing more water than the channel afforded, and on account of her draft the ship grounded; that the vessel was floated about midnight of July 6, 1920. It denies that the grounding of the ship and damage was caused by the negligence or want of skill by respondent or those in charge of the tugs, or the insufficient power of the tugs.

Testimony was taken upon the issues and the cause argued and submitted by proctors for the parties. There is conflict in the testimony of the witnesses as to who was in charge of the undocking of the ship, but, taking all the testimony of the witnesses testifying as to this particular matter and other circumstances appearing in the record, I cannot find that libelant has sustained by a preponderance of the evidence its allegations that the master of the Volunteer took charge of the maneuver and gave orders as alleged in the libel. There is also conflict as to the depth of water in the local channel leading from the phosphate dock to the main channel of the river, as well as the draft of the ship when loaded on the early night of July 3, 1920, but a consideration of all the evidence bearing upon these questions convinces me that the ship must have been drawing about 25 feet aft when she left the dock, and there was not sufficient water in the channel to permit her passage to the main river channel from the dock.

The evidence shows that the master of the ship sounded the depth of the local channel; that the ship's agent was informed that a draft of 24 feet to 24 feet 6 inches was the deepest draft which could be safely taken out of the channel, and if a deeper draft was taken out it must be at the responsibility of the ship; that it was only after discharging fuel oil that the ship was floated, and that, after replacing the fuel oil and the fresh water which had been pumped out, the vessel's draft aft was about 25 feet. These facts, which appear from the evidence, would show the ship was drawing more water than could be safely carried out of the channel when she was undocked. The protest made by the master of the ship on July 7th would seem to indicate that the pilot was in charge of the operation of undocking. This protest was made on the day after the ship was floated, and when the circumstances were fresh in his mind. There is no dispute that the master of the Volunteer was on the bridge, as well as the pilot, the master of the ship, and the third officer. Had the master of the Volunteer been in charge of the operation, it seems to me that the ship's master would have said so in his protest.

[1-4] It is unfortunate that libelant should have waited, until the lapse of time necessarily must have dimmed the memory of the witnesses as to the events, before propounding its claim; but it is the greatest sufferer by reason of the delay, for upon it rests the burden of showing by a preponderance of the evidence that the grounding and consequent damage was the result of the negligence and unskillfulness of the respondent or its servants in charge of the tugs, and this I cannot find it had done. The defense of stale claim is also made. It is contended that this defense is not tenable in this case, because the government is the owner of the ship. I do not understand this position is tenable, when the government enters in ordinary business outside of strict government matters. In such cases, as I understand the law, the government is responsible for the delay and laches of its agents, and the plea of laches will be entertained against it. In the instant case, it seems to me that this claim propounded by the libel would have to be denied on that ground also.

The libel will be dismissed.